UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
DIMARE HOMESTEAD, INC. and
DIMARE RUSKIN, INC.,

                     Plaintiffs,                        09 Civ. 6644 (PKC)

       -against-

                                           REVISED
                              FINDINGS OF FACT AND
                              CONCLUSIONS OF LAW

THE ALPHAS COMPANY OF NEW YORK, INC.,
PETER ALPHAS and YANNI ALPHAS a/k/a
JOHN ALPHAS,

                     Defendants.
-----------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

           Plaintiffs DiMare Homestead, Inc. and DiMare Ruskin, Inc. (the "DiMare

Companies" or "DiMare") bring this action against the Alphas Company of New York

("Alphas"), Peter Alphas, and John "Yanni" Alphas.  DiMare alleges that Alphas failed to pay

for tomatoes in violation of the Perishable Agricultural Commodities Act, 7 U.S.C. § 499a et seq.

("PACA").  DiMare seeks $164,159.00 in damages pursuant to a series of unpaid invoices, plus

interest and attorneys' fees.

           This case was tried before the Court without a jury on November 14 and 15, 2011.

At trial, both parties called live witnesses and offered documents into evidence.  Thereafter, the

Court received post-trial memoranda from the parties.  This Opinion sets forth the Court's

Finding of Facts and Conclusions of Law pursuant to Rule 52(a), FED. R. CIV. P.[1]

---

[1] To the extent any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law, and vice versa.  Citations to the Record are not intended to imply that the cited portion represents the only support for the Court's finding.

DiMare brings claims under PACA and New York common law theories of quantum meruit and account stated.  It also asserts a claim for failure to pay for goods received pursuant to Article 2 of the New York Uniform Commercial Code ("UCC").

The Court concludes that DiMare did not preserve its PACA trust rights for all but one of the unpaid invoices at issue in this case.  Addressing DiMare's common law claims, the Court concludes that DiMare is entitled to the reasonable value of all tomatoes delivered to Alphas under its quantum meruit theory.

FINDINGS OF FACT

I.    The Parties

1.    The DiMare Companies are Florida corporations engaged in the business of buying and selling wholesale quantities of perishable agricultural commodities (or "produce") in interstate commerce.  (PTO Stip. ¶ 1[a].)[2]  The DiMare Companies were licensed dealers under PACA at all times relevant to this action.  (Id.; PX-1.)  James DiMare was sales manager and marketing manager for the DiMare Companies at all times relevant to this action.  (Tr. 1 at 6.)

2.    Alphas is a New York corporation engaged in the business of buying and selling wholesale quantities of produce, including tomatoes, at Hunts Point Terminal Market in Bronx, New York ("Hunts Point").  (Tr. 2 at 51–52.)  Alphas was a licensed dealer under PACA at all times relevant to this action.  (PTO Stip. ¶ 1[d].)

3.    Defendants Peter Alphas and Yanni Alphas are officers and principal owners of Alphas, and have been signatories on Alphas' bank accounts since July 13, 2001.  (Id.)  Yanni Alphas negotiated prices and purchased produce, including tomatoes, on behalf of Alphas.  (Tr. 2

---

[2] Citations will be abbreviated as follows: Witnesses' affidavits are referred to as "[Last Name] Aff. ¶ __."  Stipulations from the Joint Pre-trial Order are referred to as "PTO Stip. ¶ __."  The trial transcript is referred to as "Tr. 1 at [page]" and "Tr. 2 at [page]" for the first and second days of trial, respectively.  The plaintiffs' exhibits are referred to as "PX-__" and the defendants' exhibits are referred to as "DX-__."

at 51.)  Peter Alphas received incoming produce from Alphas's wholesalers, including DiMare,

at Hunts Point where he then resold the produce to retailers.  (Tr. 2 at 87–89.)

II.      General Business Practices and Course of Dealing

     4.      The DiMare Companies sell two "labels" of green tomatoes: DiMare and

Diamond D.  Each label corresponds to a quality grade established by the U.S. Department of

Agriculture ("USDA").  Green tomatoes bearing the DiMare label are USDA Number 1 grade

("U.S. No. 1"), indicating that 85% or more of the load is free from defects.  (Tr. 1 at 7–10; PX-

2.)  Green tomatoes bearing the Diamond D label are USDA Number 2 grade ("U.S. No. 2"),

indicating that 60% or more of the load is free from defects.  (Tr. 1 at 7–10.)

     5.      DiMare's practice was to ship tomatoes to a buyer before agreeing on price.  (Tr.

1 at 25.)  As sales manager, James DiMare would contact the buyer within three days after

shipping the tomatoes to determine how many tomatoes the buyer was able to resell, and at what

price.  (Tr. 1 at 28–30.)  DiMare and the buyer would continue those discussions for several days

until the buyer sold the entire load.  (Tr. 1 at 151–52; Tr. 2 at 38.)  DiMare employed this general

practice with Alphas at all times relevant to this action.  (Tr. 1 at 61–62; Tr. 2 at 22–23, 38–39,

53.)

     6.      As sales manager for the DiMare Companies, James DiMare also maintained a

practice of adjusting the price for a shipment based upon prior dealings with a particular buyer.

(Tr. 1 at 124–46.)  During the relevant time period, DiMare sold freeze-damaged tomatoes to

certain customers from tomato crops collected and harvested in January 2009, and in turn

provided discounted prices to those buyers on later shipments.  (Tr. 1 at 139–46; Tr. 2 at 39–47.)

     7.      Alphas began regularly purchasing green tomatoes from the DiMare Companies

in October 2001.  (Tr. 1 at 33–35; Tr. 2 at 52–54.)  Alphas purchased tomatoes bearing both the

DiMare and Diamond D labels.  Tomatoes are the only type of perishable produce Alphas has ever purchased or received from DiMare.  (Tr. 2 at 53–54.)

8.      The parties used F.O.B. shipping points of Homestead, Florida, and Ruskin, Florida for all tomato deliveries during the relevant time period.  (PTO Stip. ¶ 1[i]; PX-4.)  The acronym F.O.B. refers to "Free On Board."  A sales contract containing F.O.B. shipping terms indicates that transportation expenses and the risk of loss for the goods passes from the seller to the buyer at the specified location.  (Tr. 1 at 13–14.)  See, e.g., Taylor Devices, Inc. v. Walbridge Aldinger Co., 538 F. Supp. 2d 560, 566 n.3 (W.D.N.Y. 2008) (citing U.C.C. § 2-319(1) (2004)).

9.      For all deliveries relevant to this action, DiMare sold its tomatoes to Alphas on a price-after-sale basis.  A "price after sale" transaction is one in which the seller provides the buyer with goods and the parties do not agree on price until after the buyer has resold the goods. The seller and buyer then agree on a price "in light of the profits realized by the receiver."  Tom Lange Co. v. A. Gagliano Co., Inc., 61 F.3d 1305, 1306 n.1 (7th Cir. 1995) (quoting La Verne Co-Operative Citrus Ass'n v. Mendelson-Zeller Co., 46 Agric. Dec. 1673 (1987)); see also M. Offutt Co. v. Caruso Produce, Inc., 49 Agric. Dec. 596 (1990) ("[P]rice after sale . . . [refers to an] agreement upon a price after completion of resales of the produce.").

10.     The USDA's Agricultural Marketing Service generates a daily Tomato Fax Report.  (PTO Stip. ¶ 1[h]; Tr. 1 at 14–15.)  The Tomato Fax Report contains F.O.B. shipping point prices for tomatoes by geographic sales market.  (Tr. 1 at 14–18; PX-2.)  Each report contains F.O.B. market prices from the prior day.  (Tr. 1 at 14–18; 106–07.)  The report pertaining to the New York market includes daily tomato prices for both U.S. No. 1 and No. 2 grade tomatoes.  (PX-2 at 3.)  James DiMare generally consulted the Tomato Fax Report prior to negotiating prices with his customers.  (Tr. 1 at 107.)

4

11.     Regardless of the price agreed to by the parties, DiMare charged all buyers, including Alphas, an up-front charge of $1.95 per unit (twenty-five-pound carton) for ripening and loading the tomatoes onto trucks prior to shipping.  (Tr. 1 at 13–14, 31; see, e.g., PX-4 at 2.) DiMare would deduct this up-front loading charge from the buyer's resale price when negotiating its wholesale price to the buyer.  (Tr. 1 at 30–32.)  In addition to the $1.95 per carton charge, DiMare also billed Alphas $23.50 per load for the temperature recording equipment used to ship the tomatoes.  (PX-4.)

12.     With the exception of three loads, Alphas arranged for transportation and shipping of each load of tomatoes it purchased from DiMare during the relevant time period.  (Tr. 1 at 40–41, 67–69.)

13.     DiMare billed its customers, including Alphas, with invoices.  Each invoice corresponded to a specific shipment of tomatoes.  (See, e.g., PX-4.)  DiMare would prepare and mail an invoice only after agreeing on price with the buyer after reselling the tomatoes.  (Tr. 1 at 27–29, 32–33; Tr. 2 at 23.)  In general, DiMare would mail its invoice to the customer within one day after generating the invoice.  This date was reflected as the "invoice date" on the face of each invoice.  (Tr. 1 at 33; see, e.g., PX-4.)

14.     The invoices that DiMare generated for each shipment to Alphas contained the shipment date, the date the invoice was created, the quantity of tomatoes shipped, the label of tomatoes shipped, and the price per carton for the tomatoes.  (PX-4.)  Each invoice noted the $1.95 per unit loading surcharge as "ENVIRONMENTAL/HANDLING" and the additional $23.50 charge for "TEMPERATURE RECORDER."  (Id.)

15.     All invoices also stated: "All sales due 10 days from acceptance."  (Id.)  Both parties understood this remark as requiring payment within ten days following an agreement on

price.  James DiMare included this statement on the face of each invoice to indicate that he

"expect[ed] a check in ten days."  (Tr. 1 at 55.)  As purchaser for Alphas, Yanni Alphas also

understood the payment terms with DiMare to be due ten days after an oral agreement on price

for the tomatoes delivered.  (Tr. 2 at 85.)

>        16.        The face of each invoice DiMare sent to Alphas also included the following:

> "The perishable agricultural commodities listed on this invoice are
> sold subject to the statutory trust authorized by section 5(c) of the
> Perishable Agricultural Commodities Act, 1930 (7 U.S.C.
> 499e(c)).  The seller of these commodities retains a trust claim
> over these commodities, all inventories of food or other products
> derived from these commodities, and any receivable or proceeds
> from the sale of these commodities until full payment is received."

(PX-4; Tr. 1 at 57.)  James DiMare included this language on each invoice in order to notify

customers of its intent to invoke PACA's statutory trust protections, described more fully in the

Court's Conclusions of Law.

>        17.        Each invoice DiMare sent to Alphas also stated on its face: "Interest at 1.5% a

month added to unpaid balance.  Interest and attorneys [sic] fees necessary to collect payment are

sums owing in connection with the transaction."  (PTO Stip. ¶ 1[g]; see, e.g., PX-4 at 2.)

>        18.        During the relevant time period, Alphas never provided DiMare with a written

purchase order or other document prior to shipment from DiMare.  (Tr. 1 at 51.)  The parties also

had no prior written agreement governing their relationship.  (Tr. 1 at 36–37; Tr. 2 at 53–57.)

III.    Tomato Shipments at Issue

>        19.        The events at issue concern tomatoes shipments made from DiMare to Alphas

between February and June 2009.  (PX-4 at 1.)  The record reflects that the DiMare Companies

generated a total of twenty-eight invoices for shipments to Alphas from February 10, 2009

through May 13, 2009.  (PTO Stip. Ex. B; PX-4.)  Twenty-three invoices were for shipments by

DiMare Homestead, Inc., and five were for shipments by DiMare Ruskin, Inc.  (PX-4 at 1, 25.)

     20.     The twenty-eight loads and corresponding invoices at issue are as follows:

| Invoice number | Shipping date | Invoice date | Product delivered | Quantity (in cartons) |
|---|---|---|---|---|
| 317 | 2/10/09 | 2/13/09 | DiMare<br>Diamond D | 720<br>880 |
| 543 | 2/21/09 | 5/4/09 | DiMare<br>Diamond D | 1,200<br>320 |
| 677 | 3/1/09 | 5/4/09 | Diamond D | 1,574 |
| 730 | 3/5/09 | 5/4/09 | DiMare<br>DiMare<br>Diamond D<br>Diamond D | 960<br>240<br>388<br>12 |
| 751 | 3/9/09 | 5/4/09 | Diamond D | 1,600 |
| 777 | 3/23/09 | 5/4/09 | Diamond D | 1,600 |
| 813 | 3/12/09 | 5/4/09 | DiMare | 1,600 |
| 932 | 3/19/09 | 5/4/09 | Diamond D | 1,600 |
| 1026 | 3/24/09 | 5/13/09 | DiMare | 1,600 |
| 1345 | 3/30/09 | 5/20/09 | DiMare | 1,600 |
| 1394 | 4/2/09 | 5/20/09 | DiMare | 1,600 |
| 1422 | 4/3/09 | 5/20/09 | Diamond D | 1,600 |
| 1451 | 4/7/09 | 5/20/09 | Diamond D | 1,600 |
| 1477 | 4/3/09 | 5/20/09 | DiMare | 1,600 |
| 1587 | 4/6/09 | 5/20/09 | DiMare | 1,600 |
| 1608 | 4/11/09 | 5/20/09 | DiMare | 1,600 |
| 1711 | 4/14/09 | 5/21/09 | Diamond D | 1,600 |
| 1736 | 4/14/09 | 5/21/09 | DiMare | 1,600 |
| 1803 | 4/21/09 | 5/22/09 | Diamond D | 1,600 |
| 1843 | 4/20/09 | 6/1/09 | DiMare | 1,600 |
| 1907 | 4/29/09 | 6/1/09 | DiMare | 1,600 |
| 1931 | 5/2/09 | 5/22/09 | Diamond D | 1,600 |
| 68692 | 4/21/09 | 6/18/09 | Vine (XL)<br>Vine (M) | 400<br>400 |
| 24 | 5/6/09 | 6/18/09 | Diamond D | 1,600 |
| 62 | 5/6/09 | 6/18/09 | DiMare | 1,600 |
| 99 | 5/9/09 | 6/18/09 | Diamond D | 1,600 |
| 213 | 5/13/09 | 6/19/09 | Diamond D | 1,600 |
| 346 | 5/9/09 | 6/30/09 | Diamond D | 640 |

21.     Each invoice represents shipments only of tomatoes, and only to Alphas at its Hunts Point location in Bronx, New York.  (Tr. 1 at 41, 46.)

22.     For all shipments at issue, Peter or Yanni Alphas accepted delivery of the tomatoes on behalf of Alphas at the Hunts Point market.  (Tr. 1 at 35–37; Tr. 2 at 78–80.)

23.     The USDA employs produce inspectors.  If a buyer receives a shipment of produce and believes it to be defective or of poor quality, he may request a USDA inspection of the produce.  Following the inspection, the USDA officer prepares an inspection certificate that states whether the produce passes under the applicable grading scale.  (Tr. 1 at 70; PX-5.) USDA inspectors were frequently present at Hunts Point during the events at issue.  (Tr. 2 at 67.)

24.     In January 2009, a substantial number of Florida tomato crops suffered frost and freeze-related damage because of unusually cold weather.  (Tr. 1 at 37–39; Tr. 2 at 58–59.) Neither of the DiMare companies shipped tomatoes to Alphas in January 2009.  (Id.)

25.     Alphas disputed the quality and salability of the tomatoes it received from DiMare.  Yanni Alphas testified that because of the January freeze, there were "tremendous quality issues" and "tremendous problems" with the tomatoes Alphas received from DiMare. (Tr. 2 at 58.)  In a fax dated March 30, 2009, Yanni Alphas wrote to James DiMare that the tomatoes shipped in lot 777 were "100% worthless."  (DX-3 at 1.)

26.     Alphas applied for and obtained USDA inspection reports on four shipments of DiMare tomatoes during the relevant time period.  (PX-5; Tr. 1 at 45, 69–84; Tr. 2 at 71–73.) Alphas requested two inspections of DiMare-shipped tomatoes on March 4, 2009.  (PX-5 at 1, 2.)  Both inspections were for DiMare's Diamond D, U.S. No. 2 grade tomatoes.  (Id.; Tr. 1 at 69–78.)  Both shipments received a passing grade.  Neither the certificates nor the parties can confirm the DiMare-assigned lot number of the tomatoes subject to these two inspections.  (Id.)

27.     Alphas requested and obtained two additional USDA inspections of DiMare-shipped tomatoes during the events at issue.  (PX-5 at 3, 4; Tr. 1 at 78–84.)  An inspection report dated March 26, 2009 assigned a twenty-five-pound carton of Diamond D tomatoes a failing grade by erroneously applying the USDA standard for U.S. No. 1 grade tomatoes.  (Tr. 1 at 78–80.)  This error notwithstanding, James DiMare admitted that the load still failed to meet the applicable USDA standard because of excess decay.  (Id. at 82.)  The last inspection report obtained by Alphas, dated May 4, 2009, erroneously assigned a failing grade to a shipment of DiMare U.S. No. 2 grade tomatoes.  According to the inspection report, only 13% of the tomatoes suffered serious damage, within the 40% threshold under the U.S. No. 2 standard.  (PX-5 at 4; Tr. 2 at 83–84.)

28.     Additionally, Alphas dumped four loads (twenty pallets) of tomatoes at a pig farm in Massachusetts during the relevant time period.  (Tr. 2 at 59–61, 68.)  Alphas was charged $2,700 in dumping charges by the pig farm.  (PX-12.)  The pig farm's invoice to Alphas does not state or otherwise indicate that the dumped tomatoes came from DiMare.  (See id.)

29.     In a fax to DiMare dated March 30, 2009, Yanni Alphas sought to recover from DiMare the $2,700 in dumping charges Alphas incurred.  (DX-3 at 1.)  Referring to DiMare load 777, Yanni Alphas also requested reimbursement for its freight charges and its $151.00 expense obtaining a USDA inspection of load 777.  (Id.; Tr. 2 at 7–9.)  The fax did not include or cite to a USDA dumping certificate, or offer any other documents showing Alphas's dumping-related expenses.

30.     Despite contending that "most of the product [it] received from DiMare had significant problems" and that "every load" had "rotten tomatoes" between February and May

2009 (Tr. 2 at 59), Alphas never rejected or refused to accept any of the tomato shipments at issue.  (Tr. 1 at 84; Tr. 2 at 79.)

31.    Alphas also did not obtain or provide to DiMare a USDA dumping certificate for any of the tomatoes claimed as defective.  (Tr. 1 at 84.)  Yanni Alphas testified that Alphas "tried to sell" DiMare tomatoes that were "rotten" from the January freeze, but "just discarded" those it was not able to sell.  (Tr. 2 at 58–59.)

IV.    Disputed Invoices

32.    DiMare's claims against Alphas arise from Alphas's failure to fully pay DiMare's invoices billing Alphas for the tomato shipments described above.

33.    Following each shipment, James DiMare and Yanni Alphas engaged in telephone discussions attempting to agree on price, but were unable to do so.  (Tr. 1 at 61–62, 87, 94–95.)

34.    The parties also exchanged a series of faxes attempting to agree on price for several of the disputed shipments.  (Tr. 1 at 64–65; 97; Tr. 2 at 6–32.; see, e.g., DX-3.)  In a fax to Yanni Alphas dated May 13, 2009, James DiMare requested pricing for lot numbers 1345, 1422, 1451, 1477, 1587, 1608, 1711, 1736, 1803, 1843, 1907, and 1931.  (DX-3 at 2.)[3]  Alphas replied by faxing back suggested prices handwritten on the same document.  (Tr. 2 at 10–15.)  James DiMare called Yanni Alphas after receiving the response fax and rejected the proposed prices as inadequate.  (DX-3 at 2; Tr. 2 at 14–17.)  DiMare then proposed counter-prices for the open invoices listed above, to which neither Yanni Alphas nor any other representative of the Alphas Company responded.  (Id.)

35.    DiMare sent three additional faxes to Alphas in May and June 2009 attempting to establish prices for the unpaid shipments.  (DX-5 at 3–5.)  James DiMare sent a fax dated May

---

[3] Prior to preparing an invoice, DiMare referred to tomato shipments by lot or jacket numbers.  (See, e.g., DX-5; Tr. 2 at 10–15.)  The invoice number on the invoices James DiMare ultimately generated and mailed for each shipment is identical to its lot or jacket number.  (Tr. 2 at 12–13.)

22, 2009 requesting a price of at least $2.95 for lot number 1803, to which he received no response from Alphas.  (DX-5 at 3; Tr. 2 at 18–21.)  In two additional faxes dated June 3 and June 10, DiMare requested payment for lot numbers 24, 62, 99, 213, and 346.  (DX-5 at 4, 5; Tr. 2 at 24–31.)  Alphas replied to DiMare's fax dated June 3, 2009 with suggested prices for these five lots, which DiMare rejected in a subsequent telephone call to Yanni Alphas.  (Tr. 2 at 26–28.)  In response to DiMare's June 10, 2009 fax (DX-5 at 5), Yanni Alphas handwrote suggested prices on the same document.  (Id.; Tr. 2 at 29–30.)  James DiMare never accepted Yanni Alphas's suggested prices for these lots, orally or otherwise.  (Tr. 2 at 30.)

36.    Despite these communications, the parties never manifested an agreement, oral or written, to prices for any of the loads DiMare delivered to Alphas from February 10, 2009 through May 13, 2009.  (Tr. 2 at 6–32.)

37.    Ultimately, James DiMare himself assigned a price to each load and generated invoices reflecting these amounts.  (Tr. 1 at 64–65; Tr. 2 at 23–32.)  He generally did so by adding one dollar to the prices had Yanni Alphas suggested in the faxes described above.  For all but one invoice, DiMare added one dollar per unit for shipments of DiMare tomatoes (U.S. No. 1 grade) and charged a flat rate of $2.95 per unit for shipments of its Diamond D tomatoes (U.S. No. 2 grade).  (Tr. 1 at 66–67; Tr. 2 at 18–22.)  For invoice 1345, dated May 20, 2009, Mr. DiMare charged Alphas $3.00 per carton for 1,600 DiMare tomatoes (U.S. No. 1 grade), plus the $1.95 transportation fee.  (Tr. 1 at 66; PX-4 at 12.)

38.    For three of the disputed loads—99, 213, and 346—James DiMare calculated a per-unit price that accounted for DiMare's transportation costs in shipping the tomatoes to Alphas.  (Tr. 1 at 67–69; PX-4 at 29–31.)

39.     James DiMare did not rely on the USDA Tomato Fax Report in assigning prices to these loads.  (Tr. 1 at 64–65.)

40.     James DiMare admitted to having mistakenly overcharged Alphas on two of the disputed shipments, reflected in invoices 751 and 1803.  Invoice 751, dated May 4, 2009, and invoice 1803, dated May 22, 2009, each purports to bill Alphas for a shipment of 1,600 Diamond D (U.S. No. 2 grade) tomatoes at $2.00 per carton.  (PX-4 at 7, 21.)  DiMare erred in charging a $2.00 per carton price on these shipments, intending to charge Alphas only $1.00 per carton. (Tr. 1 at 137–39.)

41.     Yanni Alphas admitted to having eventually received all twenty-eight of the disputed DiMare invoices.  (Tr. 2 at 83–85.)  However, neither Peter nor Yanni Alphas agreed to the prices stated on the invoices prior to receiving them.  (Tr. 1 at 64–66.)

42.     In June and July 2009, Alphas made partial payment by check on five of the disputed loads.  (PX-4 at 3, 7, 22, 23, 24.)  DiMare received Alphas's checks and applied payment to five of its invoices.  (Tr. 2 at 80–83.)  DiMare applied these payments as follows:

| Invoice number | Alphas check number | Date received | Check amount | Remaining invoice balance |
|---|---|---|---|---|
| 317 | 3291 | 6/8/09 | $2,343.50 | $10,240.00 |
| 751 | 36850 | 7/14/09 | $3,143.50 | $3,200.00 |
| 1843 | 36869 | 7/17/09 | $1,623.50 | $4,720.00 |
| 1907 | 36873 | 7/14/09 | $1,623.50 | $4,720.00 |
| 1931 | 36875 | 7/17/09 | $1,623.50 | $3,120.00 |

43.     Pursuant to an Order of this Court, Alphas's bank turned over to DiMare $50,353 following entry of a Temporary Restraining Order against the defendants.  (Docket # 14, 43.) The remaining amount due under DiMare's invoices forms the basis of this lawsuit.

CONCLUSIONS OF LAW

DiMare seeks to recover from Alphas the unpaid amounts under the twenty-eight disputed invoices described above.  The Court first addresses whether DiMare preserved its PACA trust benefits as to these invoices, and then addresses DiMare's common law theories of quantum meruit, account stated, and under the UCC.

I.        Plaintiffs' Claim for Failure to Pay PACA Trust Funds

        a.        General Provisions of PACA

        Congress enacted PACA in 1930 to regulate the sale of "perishable agricultural commodities." Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc., 67 F.3d 1063, 1066 (2d Cir. 1995).  The Act protects growers and sellers of perishable commodities from "the abnormal risk of losses resulting from slow-pay and no-pay practices by buyers or receivers of fruits and vegetables." Coosemans Specialties, Inc. v. Gargiulo, 485 F.3d 701, 705 (2d Cir. 2007) (quoting D.M. Rothman & Co. v. Korea Commercial Bank of N.Y., 411 F.3d 90, 93 (2d Cir. 2005)).  In enacting PACA, Congress intended to "encourage fair trading practices in the marketing of perishable commodities," suppress unfair business practices in the sale of fruits and vegetables, and provide for damages in the event a buyer or seller "fails to live up to his contractual obligations." Endico Potatoes, 67 F.3d at 1066 (quoting H.R. REP. NO. 98–543, at 3 (1983), reprinted in 1984 U.S.C.C.A.N. 405, 407).

        Section 499b of PACA defines unlawful conduct by a buyer or purchaser of perishable agricultural commodities.  Specifically, PACA makes it unlawful:

> [f]or any commission merchant, dealer, or broker to . . . fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had; or to fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with any

13

such transaction; or to fail to maintain the trust as required under
section 499e(c) of this title.

7 U.S.C. § 499b(4).  The Act thus requires produce buyers to make "full payment promptly" for

all produce they purchase.  Id.  If a buyer fails to make full payment promptly, PACA permits a

seller to recover damages by filing suit "in any court of competent jurisdiction."  Am. Banana

Co. v. Republic Nat'l Bank of N.Y., N.A., 362 F.3d 33, 36 (2d Cir. 2004) (quoting 7 U.S.C. §

499e(b)).

 PACA and its implementing regulations only apply to licensed "dealers" of

produce, 7 U.S.C. § 499a(b)(6), and only to the marketing and sale of "perishable agricultural

commodities."  Id. § 499a(b)(4).  A dealer is defined by PACA as a person or corporation

"engaged in the business of buying or selling in whole or jobbing quantities, as defined by the

Secretary, any perishable agricultural commodity in interstate or foreign commerce."  Id.  The

term "perishable agricultural commodity" includes "[f]resh fruits and fresh vegetables of every

kind and character."  Id.  In this case, both the DiMare Companies and Alphas were licensed

dealers under PACA (PX-1, 7; PTO Stip. ¶¶ 1[a], [d]), and all of the tomatoes at issue are

perishable agricultural commodities within the meaning of PACA.  (PTO Stip. ¶ 1[c].)

 b. <u>PACA's Trust Provisions</u>

 Congress amended PACA in 1984 by adding the trust provisions of 7 U.S.C.

section 499e.  Section 499e(c) "impresses a trust in favor of the sellers on the inventories of

commodities, the products derived therefrom, and the proceeds of sale of such commodities and

products."  <u>Endico Potatoes</u>, 67 F.3d at 1067 (citing H.R. REP. NO. 98–543, at 4, <u>reprinted</u> <u>in</u>

1984 U.S.C.C.A.N. 407.)  This trust provision gives the seller "a right to recover against the

purchasers, superior to all creditors, including secured creditors."  <u>Id.</u>  A PACA trust is

"automatically established each time a broker or merchant purchases perishable agricultural

14

commodities upon credit."  D.M. Rothman, 411 F.3d at 96.  Once established, the buyer is

required to "preserve[] as a nonsegregated 'floating' trust" the trust assets until it renders full

payment to the seller.  7 C.F.R. § 46.46(b).

> "A PACA trustee's primary duty is to 'maintain trust assets in a manner that such
> assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural
> commodities. Any act or omission which is inconsistent with this responsibility, including
> dissipation of trust assets, is unlawful and in violation of [PACA].'"  D.M. Rothman, 411 F.3d at
> 93–94 (quoting 7 C.F.R. § 46.46(d)(1)).  "An individual who is in a position to control the assets
> of the PACA trust and fails to preserve them, may be held personally liable to the trust
> beneficiaries for breach of fiduciary duty."  Gargiulo, 485 F.3d at 705; see, e.g., Sunkist
> Growers, Inc. v. Fisher, 104 F.3d 280, 283 (9th Cir. 1997); Dayoub Mktg., Inc. v. S.K. Produce
> Corp., 2005 WL 3006032, at *2–4 (S.D.N.Y. Nov. 9, 2005); Top Banana, L.L.C. v. Dorn's
> Wholesale & Retail Ctr., 2005 WL 1149774, at *5 (S.D.N.Y. May 16, 2005), adopted by 2005
> WL 1529736 (S.D.N.Y. June 28, 2005).

> For a produce seller to recover proceeds from a PACA trust under section 499e, it
> must establish the following:

>> (1) The commodities sold were perishable agricultural
>> commodities; (2) the purchaser of the perishable agricultural
>> commodities was a commission merchant, dealer or broker; (3) the
>> transaction occurred in interstate or foreign commerce; (4) the
>> seller has not received full payment on the transaction; and (5) the
>> seller preserved its trust rights by giving written notice to the
>> purchaser within the time provided by the law.

A & J Produce Co. v. Chang, 385 F. Supp. 2d 354, 358 (S.D.N.Y. 2005).  In this case, the

tomatoes sold were perishable agricultural commodities, DiMare and Alphas each were PACA-

licensed merchants, dealers or brokers, and the shipments between DiMare and Alphas occurred

in interstate commerce.  The parties dispute whether DiMare received full payment on its

shipments and whether DiMare properly preserved its PACA trust benefits.

"Strict eligibility requirements accompany the extraordinary protection afforded

by PACA's trust provision."  Am. Banana, 362 F.3d 33 at 42.  Importantly, a seller must provide

notice to the buyer of its intent to preserve its PACA trust benefits within the prescribed time

period.  7 § U.S.C. 499e(c)(3)–(5); 7 C.F.R. § 46.46(f).  Complying with the PACA notice

requirements is "an absolute precondition to pursuing trust assets held by a [PACA trustee]."

D.M. Rothman, 411 F.3d at 96 (quoting 49 Fed. Reg. 45735, *45738, 1984 WL 134664

(U.S.D.A. Nov. 20, 1984)).

PACA allows a seller to give notice to a buyer in one of two methods.  First, a

seller may give written notice of intent to preserve its trust benefits within thirty days of the time

payment is due (the "written notice" method).  Id. § 499e(c)(3).  Alternatively, the seller may

notify the buyer of its intent to preserve its trust benefits by including a written statement on its

printed invoices to the buyer (the "invoice method").  Id. § 499e(c)(4).  In the present case,

DiMare relied exclusively on this second method of providing notice via its printed invoices.

(PX-4; Tr. 1 at 57.)

Section 499e(c)(4) defines the seller's obligations in preserving its trust benefits

using the invoice method:

> In addition to the method of preserving the benefits of the trust
> specified in paragraph (3), a licensee may use ordinary and usual
> billing or invoice statements to provide notice of the licensee's
> intent to preserve the trust.  The bill or invoice statement must
> include the information required by the last sentence of paragraph
> (3) and contain on the face of the statement the following: 'The
> perishable agricultural commodities listed on this invoice are sold
> subject to the statutory trust authorized by section 5(c) of the
> Perishable Agricultural Commodities Act, 1930 (7 U.S.C.
> 499e(c)).  The seller of these commodities retains a trust claim

over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.'.

7 U.S.C. § 499e(c)(4).  The last sentence of paragraph (3), referenced above, states:

When the parties expressly agree to a payment time period different from that established by the Secretary, a copy of any such agreement shall be filed in the records of each party to the transaction and the terms of payment shall be disclosed on invoices, accountings, and other documents relating to the transaction.

Id. § 499e(c)(3).

Under the foregoing provisions, proper notice using the invoice method "consists of three independent requirements." Chang, 385 F. Supp. 2d at 361.  The first requirement is the invoice or billing statement must be "ordinary and usual." 7 U.S.C. § 499e(c)(4).  Ordinary and usual billing or invoice statements are defined only as "communications customarily used between parties to a transaction in perishable agricultural commodities in whatever form, documentary or electronic, for billing or invoicing purposes." 7 C.F.R. § 46.46(a)(5).  The term "transaction" has been interpreted to refer to the shipment of produce, "not contract formation." In re Ebro Foods, 449 B.R. 759, 765 (N.D. Ill. 2011) (citing In re The Caito Produce Co., 48 Agric. Dec. 602, 607–09 (1989)).

Second, as required by the last sentence of paragraph (3) of section 499e(c), sellers seeking to use the invoice method "shall" include on the invoice the terms of payment if they differ from those established by the Secretary of Agriculture.  Id.  As PACA only requires that buyers render "full payment promptly" to the seller, 7 U.S.C. § 499b(4), "Congress left the definition of prompt payment to the regulatory discretion of the Secretary of the USDA." Am. Banana, 362 F.3d at 42.  "The times for prompt accounting and prompt payment are set out in § 46.2(z) and (aa)" of PACA's regulations. 7 C.F.R. § 46.46(e)(1).  These regulations define the

default payment period as "10 days after the day on which the produce is accepted." 7 C.F.R. § 46.2(aa)(5). The buyer and seller may agree to an alternative payment period, however the maximum time for payment to which a seller can agree and still preserve its eligibility for trust benefits is "30 days after receipt and acceptance of the commodities." Id. § 46.46(e)(2). "Sellers who offer payment periods of longer than thirty days are not entitled to PACA trust protection." Am. Banana, 362 F.3d at 43 (citing 7 C.F.R. §§ 46.46(e), 46.2(aa)).[4]

The third and final requirement is the seller must include on the invoice or billing statement the trust language of section 499e(c)(4), described above and reproduced as follows:

> The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.

Id. DiMare included the required trust language of section 499e(c)(4) on the face of each of the invoices at issue. (PX-4; DX-2.)

Whether DiMare preserved its PACA trust benefits depends on whether it complied with the notice requirements detailed above. Each of the disputed invoices contains the PACA trust language specified in section 499e(c)(4), and correctly identifies Alphas as the recipient of the produce. There is also no dispute Alphas received the tomatoes billed for in the invoices. However, Alphas contends that DiMare forfeited its trust benefits by failing to provide written notice to Alphas within thirty days after expiration of the payment-due dates contained

---

[4] In April 2011, the Secretary amended 7 C.F.R. § 46.46(e)(2) to state that PACA's 30–day payment requirement applies only to agreements entered into "prior to the transaction." Id. The Final Rule promulgated by the Secretary expressly states that the amendment became effective on April 13, 2011. 76 Fed. Reg. 20217 (Apr. 12, 2011). Because the disputed shipments in this case occurred between February and May 2009, this Court applies 7 C.F.R. § 46.46(e) as construed by the Second Circuit in American Banana. See Sweet v. Sheehan, 235 F.3d 80, 88 (2d Cir. 2000); see also Northeast Trading, Inc. v. Ven–Co Produce, Inc., 2011 WL 4444511, at *3 n. 3 (S.D.N.Y. Sept. 26, 2011) (holding that the April 2011 amendments to 7 C.F.R. § 46.46(e) do not apply retroactively); A & J Produce Corp. v. City Produce Operating Corp., 2011 WL 6780614, at *5 (S.D.N.Y. Dec. 23, 2011) (same).

on the face of the invoices.  (Defs.' Post-Trial Mem. at 2.)  Alternatively, Alphas contends that

DiMare waived its trust protections by providing for an "alternate payment scheme in conflict

with the [Secretary's] default payment terms."  (Id.)  DiMare maintains that no time limits apply

where a seller provides notice using the invoice method.  (Pls.' Post-Trial Mem. at 12–14.)

        As set forth below, the Court first concludes that DiMare failed to preserve its

trust benefits for twenty-seven of the twenty-eight disputed invoices because they were not

"ordinary and usual" billing statements within the meaning of PACA.  The Court then concludes

that twenty-six invoices offer payment terms in excess of thirty days after acceptance of the

produce, and thus failed to preserve DiMare's trust rights on this alternative basis.

    c.    <u>DiMare Failed to Preserve Its PACA Trust Benefits</u>

        i.    DiMare Did Not Provide Notice Using Ordinary and Usual Invoices or
                <u>Billing Statements</u>

        The disputed invoices were neither "ordinary and usual" nor "customarily used"

between the parties within the meaning of PACA.  7 U.S.C. § 499e(c)(4); 7 C.F.R. § 46.46(a)(5).

First, the invoices did not reflect a meeting of the minds between the parties as to the terms

stated therein.  The record is replete with testimony that the parties never agreed to prices for any

of the disputed shipments.  (See, e.g., Tr. 1 at 95; Tr. 2 at 16, 30, 54–55).  James DiMare stated

plainly that he "didn't agree to th[e] prices" Yanni Alphas faxed to him during negotiations.  (Tr.

2 at 30.)  Yanni Alphas testified that the parties were still "negotiating" and "faxing back and

forth" suggested prices when he received notice of this lawsuit accompanied by a batch of the

disputed invoices.  (Tr. 2 at 55.)  And DiMare further admitted that the invoices he ultimately

constructed represented "my idea on the price" (Tr. 2 at 16) because the parties "never finalized

the prices" on any of the shipments.  (Tr. 1 at 95.)  The invoices that DiMare fashioned on his

own were neither ordinary nor usual as between the parties.

Second, the invoices were not of the type "customarily used" by DiMare and Alphas during their decade-long business relationship and established course of dealing.  Since 2001, the parties' usual course of business was to arrange for delivery by telephone, DiMare to ship the load to Alphas at the Hunts Points market, and DiMare to follow-up by telephone the next day to confirm whether the tomatoes arrived and how many Alphas was able to sell.  (Tr. 1 at 61–62; Tr. 2 at 22–23, 38–39, 52–53.)  In follow-up conversations, the parties would come to terms on a price and James DiMare would then generate and mail a physical invoice to Alphas that same day.  (See, e.g., Tr. 2 at 22–24, 52–54, 81).  DiMare further testified that "most" of his follow-up with Alphas was conducted via telephone wherein the parties "would finalize prices and [Mr. DiMare] would write them down and then follow-up with invoices."  (Tr. 2 at 22–23.)

In contrast, the invoices at issue were generated by DiMare, acting unilaterally, well after delivery and protracted, unsuccessful negotiations.  (Id. at 22–23.)[5]  For example, invoice 543 is dated May 4, 2009 and purports to charge Alphas for tomatoes delivered on February 21, while invoice 68692 is dated June 18 and purports to charge Alphas for tomatoes delivered on April 21.  (PX-4.)  Despite regularly shipping tomatoes to Alphas from February through May 2009, DiMare did not generate a single invoice between February 13 and May 5 because the parties were still "trying . . . to negotiate the prices."  (Tr. 1 at 93–95 ("We never finalized the prices.").)  DiMare acknowledged that he created the invoices "a month later from when th[e] the loads were shipped"—"highly unusual" based on the parties' established course of dealing.  (Id. at 26; see also id. at 32 (answering "yes" to question whether time frame for generating invoices was "unusually long")).  DiMare admitted that he assigned prices "trying to

_____

[5] Mr. DiMare testified that the parties had disputes over pricing in the past and had, on occasion, exchanged faxes on pricing for shipments prior to the time period at issue.  (Tr. 2 at 22–23.)  However, neither party introduced any evidence of similar exchanges or pricing disputes for shipments prior to those at issue.  Moreover, Yanni Alphas testified to not being able to recall any previous similar dispute with DiMare over pricing (Tr. 2 at 54) and further stated that the parties "had always worked things out" regarding pricing on shipped loads.  (Id. at 63.)

end the relationship" and simply "get it over with."  (Tr. 2 at 16.)  This method of pricing was

not consistent with that customarily used by the parties during their prior course of dealing and

thus the invoices were not of the type ordinarily and usually employed by the parties.

        Third, with the exception of invoice 317 dated February 13, 2009, the invoices

call for back-dated payment from Alphas.  (PX-4.)  For example, invoice 543 purports to charge

Alphas $5,707.50 for tomatoes shipped on February 21, 2009.  (Id. at 3.)  Regarding payment,

the invoice states on its face: "ALL SALES DUE 10 DAYS FROM ACCEPTANCE.  PAY

THIS INVOICE BY 3/08/2009."  (Id.)  However, invoice 543 was not created until May 4.  This

invoice thus was generated seventy-two days after shipment and calls for payment fifty-seven

days before its own creation.  The invoice also contains conflicting payment terms, seeking

payment from Alphas both within ten days of acceptance as well as by March 8 (fifteen days

after acceptance).  (Id.)  Billing statements that include conflicting and back-dated payment

terms cannot be said to be ordinary and usual within the meaning of PACA.

        Invoices that represent no agreement on pricing, were created in some cases

months after delivery, and contain back-dated and conflicting payment terms cannot be said to be

"ordinary and usual" or "customarily used" within the meaning of PACA.  See, e.g., Chang, 385

F. Supp. 2d at 362 (holding that invoices were not ordinary and usual where plaintiffs did not

show they were received by retailers).  Accordingly, with the exception of invoice 317, DiMare

failed to preserve its PACA trust benefits with respect to the amounts stated in the disputed

invoices.

        ii.     DiMare Offered Payment Terms Exceeding Thirty Days Following
                    Acceptance of the Produce

        With the exception of loads 317 and 1931, DiMare also forfeited its PACA trust

rights by permitting Alphas to render payment more than thirty days after accepting the

tomatoes.  Thirty days after acceptance of the commodities is the maximum time allowable

under the Act and its implementing regulations.  7 C.F.R. § 46.46(e)(2).  "Sellers who offer

payment periods of longer than thirty days are not entitled to PACA trust protection."  Am.

Banana, 362 F.3d at 43.  Indeed, the "plain language" of PACA and its regulations "provides that

an unpaid seller loses its right to PACA trust benefits if (1) it does not timely notify the buyer of

its intent to preserve that right or (2) it agrees to a payment period beyond 30 days."  Idahoean

Fresh v. Advantage Produce, Inc., 157 F.3d 197, 204 (3d Cir. 1998).  "The thirty-day provision"

that circumscribes a seller's right to demand payment "resulted from Congress's explicit desire

to limit its extension of trust protection to reasonably short-term credit arrangements."  Am.

Banana, 362 F.3d at 44.  Accordingly, "[s]ellers who are willing and able to enter into such

agreements—whether pre-transaction or post-default—neither need nor deserve the elevated

priority they receive under PACA's trust provision."  Id. at 45.

       Overton Distributors, Inc. v. Heritage Bank, 340 F.3d 361 (6th Cir. 2003), is

instructive.  In Overton, two PACA-licensed dealers had a written agreement requiring all

invoices "to be paid within 25 days of [the buyer's] receipt of the produce."  Id. at 364.

After several years of business, the seller "unilaterally changed" the invoices to "provide that

payment was to be received within 10 days after the end of each calendar month in which

produce was delivered."  Id. at 366.  Before commencing suit for the buyer's failure to pay

certain invoices, the seller "regularly called [the buyer] about its slow payments" and never

strictly enforced its invoices "because [the seller] thought that [the buyer] would eventually pay."

       A panel of the Sixth Circuit held that the seller failed to preserve its PACA trust

rights.  See id. at 366–68.  The unpaid invoices allowed the buyer to render payment "as late as

40 days after the date of acceptance," thus "indicat[ing] that [the seller] was agreeable to a

payment schedule outside of PACA's protection."  Id. at 366.  The court examined the practical

effect of the invoices' payment terms:

> Even though the payment terms included on the relevant invoices
> had the effect of requiring payment within thirty days on shipments
> that happened to be made after the tenth day of the prior month,
> Congress's purpose in enacting PACA was to protect sellers
> delivering their produce on essentially cash terms, not to provide
> protection to sellers who are willing to extend payment terms
> beyond the statutory maximum.

 Id. at 367.  Accordingly, the seller's "40-day maximum payment term failed to preserve its trust

benefits under PACA."  Id. at 367–68.

      The Sixth Circuit's reasoning in Overton comports with PACA's trust protections

as interpreted by this Circuit in American Banana.  "Sellers who offer payment periods of longer

than thirty days are not entitled to PACA trust protection."  Am. Banana, 362 F.3d at 43 (citing 7

C.F.R. §§ 46.46(e), 46.2(aa)).  "[N]othing in the text of PACA, in its legislative history, or in its

implementing regulations indicates that PACA's super-priority was intended to benefit sellers

who dealt in other than short-term credit in accordance with PACA's regulations."  Id. at 38

(citing H.R. REP. NO. 98–543, at 6–7 (1983), reprinted in U.S.C.C.A.N. 405, 410); see, e.g., A &

J Produce Corp., 2011 WL 6780614, at *5 (denying summary judgment where reasonable juror

could find that PACA dealers' course of dealing resulted in seller agreeing to accept payment

more than thirty days after receipt).  Rather, PACA affords trust benefits only to merchants

"selling produce on a cash or short-term credit basis."  Id. at 42.

      Here, James DiMare unilaterally generated invoices purporting to bill Alphas for

the disputed shipments.  Of the twenty-eight disputed invoices, twenty-seven were created on or

after May 4, 2009.  (PX-4.)  Of these twenty-seven, twenty-six purport to allow Alphas to render

payment more than thirty days after the shipment date.[6]  The lone exception is invoice 1931,

dated May 22, 2009—twenty days after shipment—which calls for payment by May 17, 2009,

five days before the invoice was even created.  (Id. at 24.)  Thus, with the exception of invoices

317 and 1931, DiMare forfeited its PACA trust rights by offering payment terms in excess of

thirty days.  7 C.F.R. § 46.46(e)(2); see Am. Banana, 362 F.3d at 42–43 ("Whether the

agreement [to extend payment beyond thirty days] is reached before the transaction or after a

buyer has defaulted, it constitutes a credit arrangement permitting a buyer to make payments that

are not considered prompt by Congress and the USDA."); Overton, 340 F.3d at 368 ("[Seller]

was of course free as a business matter to provide lenient payment terms . . . but by doing so it

failed to preserve its trust benefits under PACA."); Logan v. Tiegs, 2004 WL 2851949, at *30

(D. Ore. Dec. 13, 2004) ("If the date of invoice is not the same as the date of delivery, the

invoice may, in effect, permit payment more than 30 days after the date of delivery.").

   DiMare contends that a course of dealing allowing for payment more than thirty

days does not abrogate a seller's PACA trust benefits (Pls.' Post-Trial Mem. at 10–11), but cites

no authority holding that PACA's time limits requiring "prompt payment" do not apply to the

invoice method.  Nor has the Court located authority allowing a seller to preserve its trust

benefits by mailing invoices that allow payment more than thirty days after delivery.  Rather,

courts confronted with similar facts have adopted the reasoning of the Sixth Circuit in Overton.

See, e.g., Logan, 2004 WL 2851949 (relying on Overton to hold that seller failed to preserve

PACA trust rights where invoices contained 30-day payment terms but "were not delivered

immediately" to buyer, thus permitting payment beyond thirty-day limit); Brigiotta's Farmland

---

[6] No testimony or evidence was introduced establishing the precise dates on which Alphas received the disputed shipments.  Each invoice states only the date the tomatoes were shipped and the date the invoice was generated. (PX-4.)  See, e.g., Overton, 340 F.3d at 368 (relying on shipment dates in evaluating payment terms where seller did not "make any effort" to present individual delivery dates or ask the district court to ascertain them).

Produce & Garden Ctr., Inc. v. Przykuta, Inc., 2006 WL 3240729, at *3 n.3 (W.D.N.Y. July 13, 2006) (finding that seller preserved trust benefits using invoice method where "lag time" between delivery and billing was not "more than a day or two" and there was no evidence later-mailed invoices would have "extended the payment terms beyond the regulatory 30 day maximum"); In re Symons Frozen Foods Inc., 425 B.R. 589 (W.D. Wash. 2010) (holding that seller waived PACA trust claim to invoices calling for buyer to begin making installment payments over two months after delivery).

"Sellers who offer payment periods of longer than thirty days are not entitled to PACA trust protection." Am. Banana, 362 F.3d at 43. "[W]hen a seller elects to use the invoice notice option provided for by Section 499e(c)(4) in order to notify the buyer of its intent to preserve the PACA Trust, that seller must fully comply with the provisions of that paragraph in order to preserve the benefits of the Trust." In re Delyser, 295 B.R. 430, 435 (W.D.N.Y. 2003). Accordingly, DiMare forfeited its PACA trust protections for all invoices save invoice 317, dated February 13, 2009, and invoice 1931, dated May 22, 2009.

iii.   Liability of the Defendants for Dissipation of PACA Trust Assets

DiMare preserved its trust with respect to the tomatoes delivered in load 317. Alphas's failure to account or provide full payment for the tomatoes billed for invoice 317 thus constituted an unlawful dissipation of trust assets under PACA.  7 U.S.C. § 499e(c)(2); 7 C.F.R. § 46.46(d)(1).  At all times relevant to this action, defendants Peter and Yanni Alphas were officers and shareholders of Alphas, signatories on its corporate bank accounts, and listed as "Principals" on its PACA license.  (PTO Stip. ¶ 1[e]; PX-7.)  Accordingly, the defendants are jointly and severally liable for any amount stated in invoice 317 that remains unpaid following allocation of the $50,353 to be applied to any recovery ordered herein.  See, e.g., Dayoub, 2005

25

WL 3006032, at *3–4 (holding defendant personally liable for dissipating PACA trust assets as president, owner, and PACA license holder of corporate defendant).  As to the unpaid amounts remaining on all invoices other than invoice 317, the defendants are entitled to judgment in their favor as to DiMare's claim under section 499e(c).

II.         Alphas Is Liable to DiMare for the Value of the Produce Received Under Its Theory of Quantum Meruit

        a.    Legal Standard

        DiMare's failure to preserve PACA trust rights does not foreclose recovery against Alphas under a quantum meruit theory.  See, e.g., Sunrise Orchards, Inc. v. Pets Calvert Co., 2010 WL 1194203, at *9 (N.D. Ill. Mar. 23, 2010) ("[E]ven if . . . [plaintiff's] PACA trust claims fell out of PACA entirely by virtue of [plaintiff] agreeing to an extended payment plan, [plaintiff] has also sued Defendants for breach of contract").  "In order to recover in quantum meruit under New York law, a claimant must establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services."  Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005) (internal quotations omitted).  Quantum meruit is an "obligation imposed by equity to prevent injustice."  See ITD Corp. v. Morgan Stanley Dean Witter & Co., 12 N.Y.3d 132, 142 (2009).  A party may not recover under a quantum meruit theory if a valid and enforceable contract "governs the same subject matter as the quantum meruit claim."  Id. (quoting Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388 (1987)).  The plaintiff has the burden to offer a reasonable basis for estimating the value of goods or services rendered to the opposing party.  See Dresses for Less, Inc. v. Lenroth Realty Co., Inc., 260 A.D.2d 220, 221 (1st Dep't 1999).

In actions for quantum meruit involving produce covered by PACA, market prices as established by the Secretary of Agriculture are appropriate to determine the reasonable value of the goods delivered.  See, e.g., Genecco Produce, Inc. v. Sandia Depot, Inc., 386 F. Supp. 2d 165, 172 (W.D.N.Y. 2005).  In an action involving PACA produce delivered on a price-after-sale or "open market" basis, a court may consult applicable USDA daily reports of wholesale market prices in making its determination.  See, e.g., Dayoub Mktg., Inc. v. Seven Seas Trading Co., Inc., 2009 WL 890034, at *12–14 (S.D.N.Y. Mar. 31, 2009); Pacific Tomato Growers, Ltd. v. Am. Banana Co., Inc., 60 Agric. Dec. 348, 2001 WL 1891240, at *7 (2001) ("The best method of ascertaining the value the produce would have had . . . is to use the average price for the commodity at time and place of arrival, as shown by Market News Service Reports." (internal citations omitted)).  Where the fair market value of the produce is not easily ascertained, the purchase price of the goods "may turn out to be strong evidence" of their value.  Genecco, 386 F. Supp. 2d at 172 (internal citations omitted).  Where the seller's invoice price is below the corresponding USDA market price and there exists a dispute over the quality of the produce delivered, the invoice price may constitute "a reasonable measure of damages."  Dayoub, 2009 WL 890034, at *12 (S.D.N.Y. Mar. 31, 2009).

Alphas does not dispute that DiMare is entitled to the reasonable value of the tomatoes it delivered under a theory of quantum meruit.  (Docket # 85.)  Rather, Alphas contends that (1) the USDA Tomato Fax Reports should not be used to calculate the reasonable value of the tomatoes; (2) any award to DiMare should be reduced by the expenses Alphas allegedly incurred in dumping DiMare tomatoes; and (3) DiMare is not entitled to interest or attorney's fees as stated in the invoices.  (Id. at 2–3.)  Below, the Court determines the reasonable value of the tomatoes delivered to Alphas during the relevant time period.  In so doing, the Court has

considered: the quantity and USDA grade of the tomatoes; the prevailing market price for

tomatoes of the applicable USDA grade as shown in the contemporaneous USDA Tomato Fax

Report; the results of official USDA inspection reports, where applicable; and the sworn

testimony of the parties.

        b.    <u>Calculation of Reasonable Value of Tomatoes Delivered to Alphas</u>

        Alphas incurred expenses in obtaining USDA inspections and/or dumping

tomatoes for three of the twenty-eight disputed loads.  The Court first addresses the twenty-five

loads where no such evidence was offered, and will address the remaining three loads separately.

        i.    Invoice numbers 317, 543, 730, 751, 813, 932, 1026, 1345, 1394, 1422,
1451, 1477, 1587, 1608, 1711, 1736, 1803, 1843, 1907, 68692, 24, 62, 99,
<u>213, and 346</u>

        For twenty-five of the disputed loads, the Court received no evidence establishing

the precise day or days in which Alphas resold the tomatoes or that Alphas incurred expenses in

obtaining a USDA inspection or in dumping the tomatoes.  Nor did the Court hear testimony

regarding the quality of tomatoes in these specific loads or disputing that Alphas received the

quantities stated on each invoice.  (Tr. 2 at 78–80.)  The Court has thus considered USDA

Tomato Fax Reports of the New York market prices for tomatoes contemporaneous with

DiMare's shipment dates to Alphas.  As reflected in the table below, DiMare's invoice price is

less than or equal to the market price as shown in the corresponding USDA report:

| Invoice (Shipping date) | Product | Quantity | Invoice Price | USDA Market Price(s) (Date of report) |
|---|---|---|---|---|
| 317 (Feb. 10) | DiMare 5 x 6<br>Diamond D 5 x 6 | 720<br>880 | $7.00<br>$5.00 | $8.95–$9.95, "mostly" $8.95<br>$7.95–$8.95, "mostly" $7.95 (Feb. 10) |
| 543 (Feb. 21) | DiMare 5 x 6<br>Diamond D 5 x 6 | 1,200<br>320 | $2.00<br>$1.00 | $7.95–$8.95, "mostly" $7.95<br>$6.95–$7.95, "mostly" $6.95, "few" $8.95 (Feb. 20) |
| 730 (Mar. 5) | DiMare 5 x 6<br>DiMare 6 x 6 | 960<br>240 | $2.00<br>$2.00 | $8.95, "few" $7.95<br>$10.95 |

|  | Diamond D 5 x 6 | 388 | $1.00 | $7.95, "few" $6.95 |
|  | Diamond D 6 x 6 | 12 | $1.00 | $9.95 (Mar. 5) |
| 751 (Mar. 9) | Diamond D 5 x 6 | 1,600 | $2.00 | $7.95, "few" $6.95 (Mar. 9) |
| 813 (Mar. 12) | DiMare 5 x 6 | 1,600 | $2.00 | $7.95–$8.95 (Mar. 12) |
| 932 (Mar. 19) | Diamond D 5 x 6 | 1,600 | $2.00 | $6.95–$7.95 (Mar. 19) |
| 1026 (Mar. 24) | DiMare 5 x 6 | 1,600 | $2.00 | $9.95 (Mar. 24) |
| 1345 (Mar. 30) | DiMare 5 x 6 | 1,600 | $3.00 | $13.95 (Mar. 30) |
| 1394 (Apr. 2) | DiMare 5 x 6 | 1,600 | $2.00 | $13.95–$15.95 (Apr. 2) |
| 1422 (Apr. 3) | Diamond D 5 x 6 | 1,600 | $2.00 | $12.95–$14.95 (Apr. 3) |
| 1451 (Apr. 7) | Diamond D 5 x 6 | 1,600 | $1.00 | $14.95 (Apr. 6; Apr. 7) |
| 1477 (Apr. 3) | DiMare 5 x 6 | 1,600 | $2.00 | $13.95–$15.95 (Apr. 3) |
| 1587 (Apr. 6) | DiMare 5 x 6 | 1,600 | $2.00 | $15.95 (Apr. 6) |
| 1608 (Apr. 11) | DiMare 5 x 6 | 1,600 | $2.00 | $15.95, "few" $16.95 (Apr. 10) |
| 1711 (Apr. 14) | Diamond D 5 x 6 | 1,600 | $1.00 | $14.95 (Apr. 14) |
| 1736 (Apr. 14) | DiMare 5 x 6 | 1,600 | $2.00 | $15.95 (Apr. 14) |
| 1803 (Apr. 21) | Diamond D 5 x 6 | 1,600 | $2.00 | $9.95–$10.95 (Apr. 21) |
| 1843 (Apr. 20) | DiMare 5 x 6 | 1,600 | $2.00 | $11.95 (Apr. 20) |
| 1907 (Apr. 29) | DiMare 5 x 6 | 1,600 | $2.00 | $9.95, "previous commitments" $10.95 (Apr. 29) |
| 68692 (Apr. 21) | Vine (extra large) | 400 | $6.95 | $11.95 |
|  | Vine (medium) | 400 | $4.95 | $7.95–$8.95 (Apr. 21) |
| 24 (May 6) | Diamond D 5 x 6 | 1,600 | $1.00 | $5.95 (May 6) |
| 62 (May 6) | DiMare 5 x 6 | 1,600 | $1.00 | $7.95, "few" $9.95 (May 6) |
| 99 (May 9) | Diamond D 5 x 6 | 1,600 | $5.10 | $5.95 (May 8) |
| 213 (May 13) | Diamond D 5 x 6 | 1,600 | $5.45 | $4.95–$5.95 (May 13) |
| 346 (May 9) | Diamond D 5 x 6 | 640 | $5.33 | $5.95 (May 8) |

The Court concludes that with the exception of invoices 751 and 1803, the stated invoice price represents a reasonable measure of the value of the product delivered to Alphas. Having found that James DiMare intended to bill Alphas $1.00 per carton on invoices 751 and 1803 (Tr. 1 at 137–39; Tr. 2 at 18), the Court concludes that $1.00 per carton is a reasonable measure of value of the product delivered in these two loads.[7]

  ii. Invoice 677

Invoice 677 purports to charge Alphas $1.00 per carton for 1,574 U.S. No. 2, 5 x 6 tomatoes shipped on March 1, 2009.  (PX-4 at 5.)  According to the USDA Tomato Fax Report

---

[7] As the foregoing discussion ought to make plain, the invoice prices are not accepted because they appear on the face of the invoice but because they, in fact, represent a reasonable value of the delivered goods.  See Dayoub, 2009 WL 890034, at *12–14.

dated February 27, the F.O.B. South Florida price for U.S. No. 2 tomatoes was $7.95 per carton, "occas[ionally] lower." (PX-2 at 10.) Neither side offered testimony establishing the precise day or days in which Alphas resold the tomatoes shipped in load 677. Alphas did not dispute receiving the quantity stated on the invoice. (Tr. 2 at 78–80.)

The record reflects that on March 4, 2009, Alphas obtained two USDA inspection reports on DiMare-shipped U.S. Two tomatoes. (PX-5 at 1, 2.)[8] The first report states:

| Damage | Serious Damage | Offsize/Defects |
|--------|---------------|-----------------|
| 4% | 1% | Bruises (2 to 5%) |
| 4% | 4% | Decay (3 to 5%) |
| 8% | 5% | Checksum |

The second USDA inspection report, also dated March 4, 2009, states:

| Damage | Serious Damage | Offsize/Defects |
|--------|---------------|-----------------|
| 6% | 2% | Bruises (0 to 17%) |
| 3% | 3% | Soft (0 to 6%) |
| 1% | 0% | Sunken discolored areas (0 to 2%) |
| 5% | 5% | Decay (0 to 10%) |
| 15% | 10% | Checksum |

The first inspection found that of 160 cartons of Diamond D, U.S. No. 2 tomatoes inspected, 4% contained bruises, 4% decay, and 8% serious damage. (PX-5 at 1.) The second inspection found that of 440 cartons of Diamond D, U.S. No. 2 tomatoes inspected, 6% contained bruises, 3% were soft, 1% contained "sunken discolored areas," 5% showed decay, and 15% evidenced serious damage. (Id. at 2.) The USDA grading standard for U.S. No. 2 tomatoes requires them to be at least 60% free of serious damage or defect. (Tr. 1 at 7–10.) Accordingly, each of these loads earned a passing grade. (PX-5 at 1, 2; Tr. 1 at 69–78.)

---

[8] Neither the inspection certificates nor the parties confirm the DiMare-assigned lot number for the tomatoes inspected. (Id.) Based on the dates of the shipment and the two inspections reports, this Court finds that the tomatoes inspected on March 4 were the Diamond D tomatoes contained in lot 677, shipped March 1, 2009.

Neither party offered the Court a basis on which to depart from the USDA Tomato Fax Report and DiMare's requested invoice price to account for any defects found in the inspections of lot 677.  Accordingly, this Court concludes that DiMare's requested price of $1.00 per carton—well below the $7.95 market price two days before shipment—represents the value of the tomatoes delivered to Alphas reflected on invoice 677.  Alphas shall be credited $184.00, the amount expended on obtaining the two USDA inspections, as a partial offset to DiMare's total damages award.  (PX-5 at 1, 2.)

   iii.  <u>Invoice 777</u>

Invoice 777 purports to charge Alphas $2.00 per carton for 1,600 U.S. No. 2, 5 x 6 tomatoes shipped on March 23, 2009.  (PX-4 at 8.)  According to the USDA Tomato Fax Report dated March 24, the F.O.B. South Florida price for U.S. No. 2, 5 x 6 tomatoes was "$7.95–$8.95."  (PX-2.)  Neither side offered testimony as to the precise day or days in which Alphas resold or attempted to resell the tomatoes shipped in load 777.  There is no dispute that Alphas received the quantity stated on the invoice.  (Tr. 2 at 78–80.)  However, Alphas disputes the quality of the tomatoes contained in lot 777.  In a fax dated March 30, 2009, Yanni Alphas wrote to DiMare that the tomatoes in lot 777 were "100% worthless."  (DX-3 at 1.)

Alphas obtained a USDA inspection of the tomatoes in lot 777, which states:

| Damage | Serious Damage | Offsize/Defects |
|---|---|---|
| 11% | 3% | Quality Defects – External (4 to 15%) (Scars, Not Fairly Well Formed, Catfaces) |
| 5% | 0% | Sunken Discolored Areas (0 to 10%) |
| 2% | 0% | Moldy stems (0 to 6%) |
| 20% | 20% | Decay (2 to 51%) |
| 38% | 23% | Checksum |

In the space marked "GRADE," the report states that the load "fails to grade U.S. No. 1 account condition."  (PX-5 at 3.)[9]  As discussed in the Court's Findings of Fact, the USDA inspector erroneously evaluated lot 777 using the U.S. No. 1 grading standard.  Both the inspection report and the evidentiary record confirms that lot 777 contained only U.S. No. 2 tomatoes, which need be only 60% free of damage or defect to earn a passing grade.  (Tr. 1 at 7–10.)  This discrepancy notwithstanding, James DiMare testified that this lot would not have earning a passing grade even under the USDA standard for U.S. No. 2 tomatoes due to "excess decay."  (Tr. 1 at 82.)

The Court concludes that the invoice price of $2.00 per carton represents the reasonable value of the produce delivered to Alphas for invoice 777.  The F.O.B. market price for U.S. No. 2 tomatoes on March 24, the day following shipment, was $7.95 to $8.95.  (PX-2.)  As noted above, the USDA inspection report found that approximately 20% of the tomatoes showed decay, exceeding the 8% threshold for a passing grade under the applicable USDA standards.  (PX-5 at 3; Tr. 1 at 82.)  Neither party has suggested any method of calculation by which to account for the lesser quality of the tomatoes contained in lot 777.  Even discounting the value of lot 777 to reflect the inspector's finding of excess decay, DiMare's requested invoice price of $2.00 rests below any reasonable calculation of the value of the tomatoes based on the prevailing market price at the time of shipment.  See, e.g., Dayoub, 2009 WL 890034, at *13–14 (granting PACA-licensed seller invoice price for cabbage discounting percent of load that inspector found unsalable and buyer's inspection costs).[10]

The record also reflects that later that month, Alphas spent $2,700 dumping twenty pallets of tomatoes.  (DX-3 at 1; PX-12.)  Introduced at trial was an invoice from Adams

---

[9] The inspection report does not state on its face that the tomatoes inspected were from lot 777.  However, the report states the "Carrier or Lot ID" as "PO 17393," which refers to Alphas purchase order 17393—noted on the face of DiMare invoice 777.  (PX-4 at 8.)

[10] This would hold true regardless of whether the Court deducts from the prevailing market price the portion of decayed produce that resulted in a failing grade—12%—or the entire portion of the load that evidenced decay, 20%.

Farm dated March 30, 2009 billing Alphas $2,700 in dumping charges.  (PX-12.)  Although the invoice does not reference lot 777 or either of the DiMare Companies by name, Yanni Alphas cited lot 777 in his March 30 fax seeking reimbursement from DiMare.  (DX-3 at 1.)  For the purposes of this discussion, the Court assumes that the $2,700 in dumping charges Alphas incurred on March 30, 2009 were for DiMare Diamond D tomatoes shipped in lot 777.  The parties agree that Alphas did not obtain official dumping certificates or USDA-approved documentation prior to disposing of the tomatoes.  (PTO Stip. ¶ 1[f]; Tr. 1 at 84; Tr. 2 at 58–59.)  DiMare contends that Alphas's failure to properly document its dumping expenses vitiates any claim to a set-off in calculating the amount owed to DiMare.  (Pls.' Post-Trial Mem. at 8–10.)

Sections 46.22 and 46.23 of PACA's regulations contain the dumping-related obligations of a licensed produce dealer.  7 C.F.R. §§ 46.22, 46.23.  Section 46.22 states that if a consignment buyer dumps "five percent or more" of a shipment, it must obtain an official certificate or "other adequate evidence" showing the produce was without commercial value.  Section 46.23 provides means of securing other adequate evidence of dumping, such as certification by a state health inspector, a commercial agency in the produce industry, or two financially disinterested persons experienced in inspecting produce.  In applying these regulations, the Secretary of Agriculture has held that "[i]n a sale transaction, dumping of *any* portion must be substantiated by a dump certificate or other appropriate evidence."  Carmack v. Selvidge, 51 Agric. Dec. 892, 901–02 (1992) (emphasis added); see also id. at 892 ("In an open sale transaction, dumping of any portion of the produce must be substantiated by a dump certificate or other appropriate evidence.").  "An agency's interpretation of its own regulation is accorded substantial deference unless that interpretation is inconsistent with the plain language of the regulation."  Kone v. Holder, 596 F.3d 141, 146 (2d Cir. 2010) (internal quotations and

citation omitted).  Accordingly, a PACA-licensed receiver's dumping of any produce in a price-after-sale transaction requires either an official USDA certificate or other adequate evidence. See Tom Lange Co. v. A. Gagliano Co., 61 F.3d 1305, 1309–11 (7th Cir. 1995) (holding that regardless of whether section 46.22 or 46.23 applies, recipient of cabbage in price-after-sale transaction "still faced a general obligation to document its dumping").

Alphas failed to provide an official certificate or other appropriate evidence of its dumping expenses.  First, the parties stipulated before trial that Alphas did not comply with any portion of section 46.23 of the Secretary's regulations, which applies to "any" produce received by a licensed dealer.  (PTO Stip. ¶ [f].)  Yanni Alphas admitted to not obtaining a dumping certificate from a USDA official.  (Tr. 2 at 76–80.)  The only evidence offered is a single invoice from Adams Farm dated March 30, 2009.  (PX-12.)  However, the invoice does not identify DiMare, the USDA grade of the tomatoes, the date they were received by Alphas, whether the loads dumped were ever inspected by a USDA official, or any lot or shipment number identifying the tomatoes as a DiMare load.  (Id.; see also Tr. 2 at 74–78.)  Indeed, Yanni Alphas testified that he was "not sure what load [the dumping charge] pertains to."  (Tr. 2 at 77.)

Alphas contends that the parties' prior course of dealing waived any obligation it had to obtain the evidence of dumping specified by PACA.  (Defs.' Post-Trial Mem. at 1.) However, the entirety of the defendants' evidence on this issue consists of Yanni Alphas's testimony that during the previous nine years of the parties' relationship, Alphas had "dumped loads in the past" and that the parties would then "work[] things out" in setting the price.  (Tr. 2 at 63; 68.)  This testimony, standing alone, does not prove that DiMare ever reimbursed Alphas for its dumping charges without seeking USDA certification or other appropriate evidence, how often such instances might have occurred, or for which particular loads DiMare reimbursed

Alphas.  And contrary to this testimony, James DiMare testified never having received notice of Alphas dumping a load of its tomatoes before this lawsuit.  (Tr. 1 at 84–85.)  Alphas is not entitled to a set-off for the $2,700 in dumping charges it incurred.

DiMare's stated invoice price of $2.00 per carton represents a reasonable value of the tomatoes delivered to Alphas in load 777.  Alphas is entitled to a set-off of $151.00 from this award for its cost of inspecting the tomatoes in load 777 (PX-5 at 4), but not for the $2,700 it incurred in dumping tomatoes at Adams Farm.  (PX-12.)

iv.   Invoice 1931

Invoice 1931 purports to charge Alphas $1.00 per carton for 1,600 U.S. No. 2, 5 x 6 tomatoes shipped on May 2, 2009.  (PX-4 at 24.)  According to the USDA Tomato Fax Report dated May 1, 2009, the F.O.B. South Florida price for U.S. Two tomatoes was $8.95.  (PX-2.)  Neither side offered testimony as to the precise day or days in which Alphas resold the tomatoes shipped in load 1931.  There is no dispute that Alphas received the shipment.  (Tr. 2 at 78–80.)

Alphas spent $151.00 in obtaining a USDA inspection report of the tomatoes contained in lot 1931.  (PX-5 at 4.)  The inspection report states:

| Damage | Serious Damage | Offsize/Defects |
|--------|----------------|-----------------|
| 0% | 0% | Quality defects |
| 3% | 1% | Bruises (0 to 7%) |
| 1% | 1% | Soft (0 to 4%) |
| 9% | 9% | Decay (2 to 18%) |
| 13% | 11% | Checksum |

The inspection concluded that the tomatoes "fail[ed] to grade U.S. No. 2 account condition." (Id.)  As discussed in the Court's Findings of Fact, the USDA inspector's conclusion was in error.  Because green tomatoes need only be 40% free of damage to earn a passing grade, the Diamond D tomatoes contained in lot 1931 satisfied the applicable USDA standard for U.S. No. 2 tomatoes.  (Tr. 1 at 83–84.)

Neither party offered a basis on which to depart from the $8.95 USDA market price or DiMare's invoice price to account for any defects found during the inspection. Accordingly, this Court concludes that DiMare's requested price of $1.00 per carton represents a reasonable value of the tomatoes delivered to Alphas in invoice 1931. Alphas is entitled to a set-off in the amount of $151.00 for its expense in obtaining a USDA inspection on this load.

      c.      <u>Loading and Freight Expenses Incurred by DiMare</u>

The record indicates that DiMare also incurred expenses in transporting the disputed loads. (PX-3; PX-4.) The only evidence offered as to DiMare's loading and ripening costs are DiMare's invoices, twenty-four of which purport to bill Alphas $1.95 per carton for "ENVIRONMENTAL/HANDLING," and all a flat rate of $23.50 for "TEMPERATURE RECORDER." (PX-4.) The record also indicates that DiMare incurred additional expense shipping the tomatoes in loads 99, 213, and 346. (Tr. 1 at 67–69.) DiMare's shipping manifests confirm the dates on which each load was shipped. (PX-3.) The Court received no evidence at trial aside from the shipping manifests, relevant invoices, and James DiMare's testimony by which to calculate these additional expenses. Accordingly, the Court concludes that the sum of $1.95 per carton and $23.50 per load represents a reasonable measure of the value of DiMare's loading and ripening services to Alphas. The invoiced unit prices for loads 99, 213, and 346, inclusive of DiMare's freight expenses for these three loads, likewise represent a reasonable value for DiMare's services to Alphas. These amounts shall be added to DiMare's total recovery under its quantum meruit.

      d.      <u>Total Amount Owed for Tomatoes Delivered</u>

Based upon the Court's determination of the reasonable value of the tomatoes delivered to Alphas, DiMare is entitled to the following recovery under quantum meruit:

| Invoice number | Quantity | USDA Grade | Price per carton | Transportation charges | Total amount due[11] |
|---|---|---|---|---|---|
| 317 | 720 | 1 | $7.00 | $3,143.50 | $10,240.00 |
|  | 880 | 2 | $5.00 |  |  |
| 543 | 1,200 | 1 | $2.00 | $2,987.50 | $5,707.50 |
|  | 320 | 2 | $1.00 |  |  |
| 677 | 1,574 | 2 | $1.00 | $3,092.80 | $4,666.80 |
| 730 | 960 | 1 | $2.00 | $3,143.50 | $5,943.50 |
|  | 240 | 1 | $2.00 |  |  |
|  | 388 | 2 | $1.00 |  |  |
|  | 12 | 2 | $1.00 |  |  |
| 751 | 1,600 | 2 | $1.00 | $3,143.50 | $1,600.00 |
| 777 | 1,600 | 2 | $2.00 | $3,143.50 | $6,343.50 |
| 813 | 1,600 | 1 | $2.00 | $3,143.50 | $6,343.50 |
| 932 | 1,600 | 2 | $2.00 | $3,143.50 | $6,343.50 |
| 1026 | 1,600 | 1 | $2.00 | $3,143.50 | $6,343.50 |
| 1345 | 1,600 | 1 | $3.00 | $3,143.50 | $7,943.50 |
| 1394 | 1,600 | 1 | $2.00 | $3,143.50 | $6,343.50 |
| 1422 | 1,600 | 2 | $2.00 | $3,143.50 | $6,343.50 |
| 1451 | 1,600 | 2 | $1.00 | $3,143.50 | $4,743.50 |
| 1477 | 1,600 | 1 | $2.00 | $3,143.50 | $6,343.50 |
| 1587 | 1,600 | 1 | $2.00 | $3,143.50 | $6,343.50 |
| 1608 | 1,600 | 1 | $2.00 | $3,143.50 | $6,343.50 |
| 1711 | 1,600 | 2 | $1.00 | $3,143.50 | $4,743.50 |
| 1736 | 1,600 | 1 | $2.00 | $3,143.50 | $6,343.50 |
| 1803 | 1,600 | 2 | $1.00 | $3,143.50 | $4,743.50 |
| 1843 | 1,600 | 1 | $2.00 | $3,143.50 | $4,720.00 |
| 1907 | 1,600 | 1 | $2.00 | $3,143.50 | $4,720.00 |
| 1931 | 1,600 | 2 | $1.00 | $3,143.50 | $3,120.00 |
| 68692 | 400 | Plum (XL) | $6.95 | $23.50 | $4,783.50 |
|  | 400 | Plum (M) | $4.95 |  |  |
| 24 | 1,600 | 2 | $1.00 | $3,143.50 | $4,743.50 |
| 62 | 1,600 | 1 | $1.00 | $3,143.50 | $4,743.50 |
| 99 | 1,600 | 2 | $5.10 | $23.50 | $8,183.50 |
| 213 | 1,600 | 2 | $5.45 | $23.50 | $8,743.50 |
| 346 | 640 | 2 | $5.33 | $23.50 | $3,434.70 |
| **Total Due** |  |  |  |  | **$160,959.00** |

[11] The amounts reflected in this column account for the five partial check payments on loads 317, 751, 1843, 1907, and 1931 that Alphas made to DiMare prior to commencement of this suit.  (PX-4 at 3, 7, 22, 23, 24.)

Alphas is entitled to a set-off from this award for its expenses in obtaining three USDA inspections on these loads:

| Inspection report number (last 4 digits) | Date of inspection | Product inspected | Fee to Alphas |
|---|---|---|---|
| 3822 | March 4, 2009 | Diamond D (U.S. No. 2) | $184.00 |
| 4547 | March 26, 2009 | Diamond D (U.S. No. 2) | $151.00 |
| 4003 | May 4, 2009 | DiMare (U.S. No. 1) | $151.00 |
| **Total Spent** | | | **$486.00** |

III.          Plaintiffs' Claim for an Account Stated

DiMare also brings a claim for account stated, seeking from Alphas the full invoice prices plus 18% interest per annum and attorneys' fees as stated on the face of each invoice.  (Tr. 2 at 47; Docket # 84.)  To the extent that DiMare is entitled to recover certain sums under both its quantum meruit and account stated claims, it is entitled to only a single award.  Conway v. Icahn & Co., 16 F.3d 504, 511 (2d Cir. 1994) ("Where a plaintiff seeks recovery for the same damages under different legal theories, only a single recovery is allowed.").  As the Court has already concluded that DiMare is entitled to its invoice price for tomatoes delivered under quantum meruit, the Court need only address DiMare's claim for interest and attorneys' fees under its account stated theory.

An account stated is an "agreed upon [ ] balance of indebtedness" based on a promise of payment.  Newburger-Morris Co. v. Talcott, 219 N.Y. 505, 512 (1916).  Under New York law, a claim for an account stated requires the existence of "an agreement between the parties to an account based on prior transactions between them."  LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 64 (2d Cir. 1999).  To state a claim, "the plaintiff must plead that: (1) an account was presented; (2) it was accepted as correct; and (3) debtor promised to pay the amount stated."  IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009) (internal quotations omitted).

38

An agreement constituting an account stated may be express or implied.  An agreement may be implied if "a party receiving a statement of account keeps it without objecting to it within a reasonable time."  LeBoeuf, 185 F.3d at 64 (internal quotations omitted).  "[A]n account which has been rendered and to which no objection has been made within a reasonable time should be regarded as admitted by the party charged as prima facie correct."  United Capital Funding Corp. v. N.Y. City Dep't of Ed., 2012 WL 255248, at *2 (2d Cir. Jan. 30, 2012) (internal quotations omitted).  Any objections by the debtor must be directed to the creditor and relate to the account at issue.  See, e.g., Seward & Kissel v. Smith Wilson Co., Inc., 814 F. Supp. 370, 372 (S.D.N.Y. 1993) (granting summary judgment to plaintiff where defendant did not object in any prior correspondence).  An agreement also may be implied if the debtor renders partial payment.  Levisohn, Lerner, Berger & Langsam v. Gottleib, 309 A.D.2d 668, 668 (1st Dep't 2003).  Remittance of partial payment is considered an acknowledgment of the validity of the bill or invoice.  Parker Chapin Flattau & Klimpl v. Daelen Corp., 59 A.D.2d 375, 378 (1st Dep't 1997).

However, "[r]ecovery premised upon an account stated will fail where a dispute about the account can be shown to have existed."  United Capital Funding, 2012 WL 255248, at *2 (quoting Farley v. Promovision Video Displays Corp., 603 N.Y.S. 2d 476, 477 (1st Dep't 1993)).  "There can be no account stated where no account was presented or where *any* dispute about the account is shown to have existed."  Abbott, Duncan & Wiener v. Ragusa, 214 A.D.2d 412, 413 (1st Dep't 1995) (emphasis added).  Where "there is any dispute regarding the correctness of the account, the cause of action fails."  M & A Constr. Corp. v. McTague, 800 N.Y.S.2d 235, 237–38 (3d Dep't 2005).

DiMare has failed to show an account stated.  Under New York law, "an account is not agreed to where the defendant has raised an objection to the plaintiff's billings or the quality of the plaintiff's work."  United Capital Funding, 2012 WL 255248, at *2 (collecting cases).  Even "a general objection [that] precedes the plaintiff's statement of an account" will bar the existence of an agreement to treat an invoice as an account stated.  Id.  Here, Alphas disputed the prices DiMare sought to charge.  (Tr. 1 at 64–66; Tr. 2 at 6–32.)  James DiMare admitted that the parties never agreed on prices and that the invoiced prices reflected his own calculations. (Tr. 1 at 93–95; Tr. 2 at 16.)  Faxes exchanged by the parties in May and June 2009 also show disputes over pricing of specific loads (DX-3; DX-5 at 2–5), sufficient to indicate Alphas's objection to DiMare's billing.  See, e.g., M & A Constr., 800 N.Y.S.2d at 237–38 (affirming dismissal of account stated claim where "defendants disputed aspects of the accounts and informed plaintiff that payment was being withheld").

There is also no evidence that after receiving the invoices, Alphas expressly agreed to treat the invoiced amounts as accounts stated.  Gurney, Becker & Bourne, Inc. v. Benderson Dev. Co., 47 N.Y.2d 995, 996 (1979) (holding that successful account stated claim "assumes that there exists some indebtedness owing between the parties or an *express agreement* between the parties to treat the statement as an account stated") (emphasis in original).  "[T]he very meaning of an account stated is that the parties have come together and agreed upon the balance of indebtedness."  Herrick, Feinstein LLP v. Stamm, 297 A.D.2d 477, 478 (1st Dep't 2002) (internal quotations omitted).  Although Alphas mailed a series of five bank checks to DiMare that it then applied to five of the disputed loads (PX-4 at 3, 7, 22, 23, 24), DiMare presented no evidence that Alphas agreed to the total amounts sought in the invoices as a validly stated account.  See, e.g., GSGSB, Inc. v. N.Y. Yankees, 862 F. Supp. 1160, 1176–77 (S.D.N.Y.

40

1994) (granting summary judgment to defendant where underlying contract was disputed and plaintiff offered no evidence that defendant agreed "to treat the [disputed] invoices as an account stated"); M & A Constr., 21 A.D.3d at 237–38 (affirming denial of account stated where defendants "disputed aspects of the accounts").  Indeed, Yanni Alphas testified to having mailed the checks to DiMare before even receiving the disputed invoices.  (Tr. 2 at 80–84.)  The evidence received at trial does not show agreement to an account stated.  See Abbott, 214 A.D.2d at 413 (denying account stated claim where defendant "disputed the amount billed as well as the quality of the work performed"); Navimex S.A. de C.V. v. S/S "Northern Ice", 617 F. Supp. 103, 106 (S.D.N.Y. 1984) (denying account stated claim where "there was an underlying dispute between the parties" as shown by defendant's objection before receiving billing statements, "thereby precluding a finding of consent by the defendants").

Even had Alphas not validly objected, DiMare has not shown that Alphas failed to do so within a "reasonable time."  LeBoeuf, 185 F.3d at 64.  With the exception of invoice 317, the invoices were all created on or after May 4, 2009.  (PX-4.)  DiMare filed this lawsuit on July 27, 2009.  (Docket # 1.)  DiMare offers no authority that a time period of less than three months is sufficient to waive Alphas's right to object.  See Zhuhai Winners M & E Ltd. v. Hudson Valley Umbrella Co., 660 F. Supp. 2d 551, 555–56 (S.D.N.Y. 2009) ("Where, as here, a plaintiff has filed a lawsuit less than four months after presenting the defendant with its first purported statement of account . . ., its argument that an implied account stated was created by the defendant's failure to object is unpersuasive."); Stamm, 297 A.D.2d at 478 (holding that "defendant's first objection . . . two months after receipt of the first of the invoices" showed objection to the stated balances).  Cf. Healthcare Capital Mgmt., LLC v. Abrahams, 300 A.D.2d

108, 108 (1st Dep't 2002) (holding that buyer failed to object within a reasonable time where it objected to pair of invoices six and ten months after receiving them).

    For the foregoing reasons, DiMare's account stated claim is denied.

IV.    <u>Plaintiffs' Claim Under the UCC</u>

    Lastly, the plaintiffs seek recovery against Alphas under the UCC.  DiMare first seeks the reasonable value of goods delivered to Alphas under UCC § 2–305(4).  DiMare also contends that its invoices to Alphas constituted a contract, and that because the provisions calling for 18% interest per annum and attorneys' fees were stated on each invoice and not "rejected" by Alphas, they became a part of that contract.  (Pls.' Post-Trial Reply Mem. L. at 5–6.)

    "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound."  <u>Leibowitz v. Cornell Univ.</u>, 584 F.3d 487, 507 (2d Cir. 2009). In New York, Article 2 of the UCC applies to contracts for the sale of goods.  <u>See</u> <u>Dallas Aerospace, Inc. v. CIS Air Corp.</u>, 352 F.3d 775, 779 n.1 (2d Cir. 2003).  Under UCC § 2–204, "[a] contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  N.Y. UCC § 2–204(1); <u>see also</u> <u>Intersynco Suisse, S.A. v. Amtraco Supply Co., Inc.</u>, 590 F.2d 55, 56 (2d Cir.1979).  "In a contract for a sale of goods, the essential terms are quantity, price, and time and manner of delivery."  <u>Fakhoury Enters., Inc. v. J.T. Distribs.</u>, 1997 WL 291961, at *3 (S.D.N.Y. June 2, 1997) (quoting <u>Judal Indus. v. Welsbach Elec. Corp.</u>, 138 A.D.2d 573, 573 (1988)) (internal quotations omitted).  "[W]hen a dispute as to a material term manifests a lack of intention to form a contract, no enforceable contract results."  <u>Id.</u> (quoting <u>Kleinschmidt Div. of SCM Corp. v. Futuronics Corp.</u>, 41 N.Y.2d 972, 973 (1977)).

Attorneys' fees are not recoverable "unless authorized by agreement between the parties, statute, or court rule." Oscar Gurss & Son, Inc. v. Hollander, 337 F.3d 186, 199 (2d Cir. 2003).

      DiMare may not recover interest and attorneys' fees as stated in its invoices under this theory. The record is replete with evidence that the parties had a genuine dispute over price and quality of the produce reflected in the invoices. (Tr. 1 at 93–95; Tr. 2 at 16, 30.) Based on the evidentiary record and testimony heard at trial, the Court cannot conclude that the parties evinced conduct "sufficient to show agreement" under UCC § 2-204. Nor can the interest and attorneys' fees provisions be deemed "additional terms" to a contract between merchants under UCC § 2-207(2)(b) or a "confirmation of" an existing contract under UCC § 2-201(2). The parties had no prior written agreement governing their relationship, had not agreed to all material terms orally and otherwise, and Alphas never provided DiMare purchase orders or other documentation before DiMare unilaterally inserted payment terms on the invoices it generated. (Tr. 1 at 36–37, 51; Tr. 2 at 53–57.)

      To the extent DiMare is entitled to the reasonable value of goods delivered to and accepted by Alphas under UCC § 2-305(4), such recovery would be duplicative of its quantum meruit award and need not be addressed separately.

V.      Prejudgment Interest and Attorneys' Fees Under PACA

      PACA does not establish an independent right to prejudgment interest or attorneys' fees. E. Armata, Inc. v. Platinum Funding Corp., 887 F. Supp. 590 (S.D.N.Y. 1995). However, the Second Circuit has held that "where the parties' contracts include a right to attorneys' fees, they can be awarded 'sums owing in connection with' perishable commodities under PACA." Gargiulo, 485 F.3d at 709 (quoting 7 U.S.C. § 499e(c)(2)). Attorneys' fees are

thus not available under PACA "where a contractual basis for the fees is lacking." E. Armata, 887 F. Supp. at 594.

Nor does PACA provide for an award of prejudgment interest. Tray-Wrap, Inc. v. Meyer, 1994 WL 710804, at *7 (S.D.N.Y. Dec. 20, 1994) (Cote, J.) ("Under federal law, prejudgment interest is committed to the sound discretion of the court, and is governed by considerations of equity and fairness."); see also Dayoub, 2005 WL 3006032, at *4 (noting that PACA "does not establish a right to interest and collection costs"). However, a PACA trust beneficiary may recover prejudgment interest where the parties' contract so provides. Country Best v. Christopher Ranch, LLC, 361 F.3d 629, 632 (11th Cir. 2004) (awarding interest and attorneys' fees to PACA trust beneficiary "as additional contract terms under the [UCC]"). Ultimately, whether prejudgment interest is available in a PACA case is "confided to the district court's broad discretion." Endico Potatoes, 67 F.3d at 1071.

Having rejected DiMare's claims for account stated and under the UCC based on the Court's finding that no enforceable contract existed between the parties, the Court denies DiMare's request for prejudgment interest at 18% per annum and attorneys' fees as identified in DiMare's invoices. Cf. Gargiulo, 485 F.3d at 709 (affirming award of attorneys' fees to PACA trust beneficiary where invoices "created an enforceable contract" between the parties).

VI.     Prejudgment Interest Under New York Law

Although the Court finds no enforceable agreement between the parties, DiMare may be entitled to prejudgment interest under New York law. The New York Civil Practice Law and Rules provides that prejudgment interest "shall" be recoverable "upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an

44

action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion."  N.Y. C.P.L.R. § 5001(a).  In actions for money damages, the New York statutory rate for prejudgment interest is 9% per annum.  Id. § 5004.  Where the plaintiff incurs damages at "various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date."  Id. § 5001(b).

Courts applying New York law to state law claims "disagree as to whether an award of prejudgment interest on a quantum meruit recovery is discretionary or mandatory." Chernis v. Swarzman, 2007 WL 2230078, at *13 (S.D.N.Y. Aug. 2, 2007).  The weight of authority reflects that prejudgment interest is mandatory on a quantum meruit claim.  Stillman v. InService Am. Inc., 738 F. Supp. 2d 480, 481–82 (S.D.N.Y. 2010) (collecting New York and Second Circuit authority); see also Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff, 638 F. Supp. 714, 721 (S.D.N.Y. 1986) (holding that C.P.L.R. § 5001's mandatory interest award for breach of contract claims "applies both to an action for quantum meruit and an action for account stated" (internal citation omitted).).

Generally, state law "governs the award of prejudgment interest" in a case founded on diversity jurisdiction.  Schipani v. McLeod, 541 F.3d 158, 164 (2d Cir. 2008). However, "the applicability of state law [regarding prejudgment interest] depends on the nature of the issue before the federal court and not on the basis for its jurisdiction."  Mallis v. Bankers Trust Co., 717 F.2d 683, 692 n.13 (2d Cir. 1983).  State law thus governs the issue of prejudgment interest on pendant or supplemental state law claims brought in federal court. Marfia v. T.C. Ziraat Bankasi, 147 F.3d 83, 90 (2d Cir. 1998).  Ultimately, the Second Circuit has made clear that "[t]he decision whether to grant prejudgment interest and the rate used if such interest is granted 'are matters confided to the district court's broad discretion, and will not

be overturned on appeal absent an abuse of that discretion." Endico Potatoes, 67 F.3d at 1071 (internal quotations omitted).

In Endico Potatoes, the district court awarded prejudgment interest on claimants' PACA claim at a rate of 6.09% per annum, the applicable federal rate for postjudgment interest under 28 U.S.C. § 1961. Id. at 1072. On appeal, the PACA claimants argued that the district court should have used the New York statutory rate of 9% per annum. The Second Circuit held that Judge Sand's decision to use the federal rate in calculating prejudgment interest was not an abuse of discretion because the PACA claim, "despite similarities to common law actions based on breach of trust," was "purely a product of a federal statute." Id.

In this case, DiMare asserted jurisdiction based on PACA, a federal statute, pursuant to 28 U.S.C. § 1331. (Compl. ¶ 1.) However, the Court has concluded DiMare is entitled to recover under its state-law quantum meruit theory. Assuming arguendo that the Court had discretion not to award prejudgment interest on the quantum meruit claim, the Court would nevertheless grant the plaintiffs prejudgment interest. In this case, the Court awards prejudgment interest to DiMare at the statutory rate of 9% per annum. See, e.g., Nathel & Nathel, Inc. v. Carlos Produce, 2009 WL 3297799, at *3 (E.D.N.Y. Oct. 9, 2009) (awarding prejudgment interest at New York rate of 9% for claim asserted "both" under PACA and for breach of contract).

VII.        Application of Monies Already Received

After commencement of this suit, Alphas turned over to DiMare, pursuant to Court Order, the sum of $50,353 for debts Alphas conceded it owed to DiMare. (Docket # 14, 16, 43.) "As a general rule, payment is applied to debts in the order in which they accrue." L & B 57th St., Inc. v. E.M. Blanchard, Inc., 143 F.3d 88, 91 (2d Cir. 1998). "[A] debtor owing

46

several accounts to a single creditor may designate the account to which a payment is to be applied." Susi v. Belle Action Stables, Inc., 267 F. Supp. 293, 295 (S.D.N.Y. 1967).  On the other hand, "a payment made without direction by the debtor or the creditor will be applied to the oldest matured claim." AT&T Corp. v. Publ'g Concepts L.P., 2010 WL 1191380, at *5 (S.D.N.Y. Mar. 29, 2010) (Chin, J.) (quoting 28 Williston on Contracts § 72:19 (4th ed.)).

Here, DiMare restrained a bank account belonging to Alphas pursuant to Orders of this Court.  (Docket # 14, 43.)  In so doing, DiMare retrieved $50,353 from the account, to which Alphas conceded owing DiMare.  Alphas introduced no evidence at trial that this payment was directed toward specific invoices so as to rebut the general rule that payments are applied to debts in the order in which they accrue. E.M. Blanchard, 143 F.3d at 91.  Accordingly, the amount of $50,353 will be applied to DiMare's total recovery, beginning with the oldest outstanding invoice at issue, invoice 317.  (PX-4 at 2.)

CONCLUSION

For the reasons set forth above, the Court concludes that DiMare is entitled to compensatory damages in the amount of $110,120.00, representing (1) the $160,959.00 in produce it delivered to Alphas under its quantum meruit theory, (2) less the $50,353.00 already restrained from Alphas's bank account, and (3) less the $486.00 Alphas spent obtaining USDA inspection reports of DiMare produce.  This award shall be applied to each invoice beginning with invoice 317 in the order in which the amounts accrued.  DiMare is entitled to prejudgment interest at the New York statutory rate as noted above.

DiMare may submit a proposed judgment within 14 days hereof.  The defendants may respond 14 days thereafter; and DiMare may reply 7 days after said response.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       April 5, 2012